In the Matter of LENORE LEONE, Petitioner, v BARBARA BLUM, as Acting Commissioner of the New York State Department of Social Services, et al., Respondents.

In the Matter of MARY DELMAR, on Behalf of Herself and All Others Similarly Situated, Petitioner, v BARBARA BLUM, as Commissioner of the New York State Department of Social Services, et al., Respondents.

Second Department, March 10, 1980

### APPEARANCES OF COUNSEL

*Leonard S. Clark (Ira S. Schneider* of counsel), for Lenore Leone, petitioner.

*Robert Abrams, Attorney-General (Gerald Slotnik* of counsel), for State Commissioner in the *Leone* proceeding, respondent.

*Leonard S. Clark (Stephen Latzman* of counsel), for Mary Delmar, petitioner.

*Robert Abrams, Attorney-General (Maryellen Weinberg* of counsel), for State Commissioner in the *Delmar* proceeding, respondent.

### OPINION OF THE COURT

GULOTTA, J.

Petitioners in these proceedings challenge the method by which the Commissioner of the New York State Department of Social Services allocates public assistance in the categories of Aid to Dependent Children and Home Relief under section 131-a of the Social Services Law and the accompanying regulations.

█ We hold that the commissioner's proration method as applied to households which include members who are the recipients of Federal benefits under the Old-Age, Survivors, and Disability Insurance program and the Supplemental Security Income program is invalid as a matter of law.

The underlying facts are essentially undisputed.

In the first proceeding the petitioner, Lenore Leone, resides in a household consisting of herself and her two minor children, Stephanie and Antonio. Sometime prior to June 30, 1977, the Suffolk County Department of Social Services reevaluated Mrs. Leone's three-person grant of public assistance in the category of Aid to Dependent Children (ADC) (Social Services Law, § 343 *et seq.)* and, on or about August 16, 1977, notified the petitioner that her shelter allowance was being reduced in order to reflect her daughter's loss of eligibility for ADC due to her receipt of Federal benefits under the Old-Age, Survivors and Disability Insurance program (OASDI). The department indicated that Mrs. Leone would henceforth be receiving only a pro rata (two-thirds) portion of her prior

allowance, the foregoing in recognition of the continuing eligibility of only two persons in her three-person household. As has already been indicated, this calculation was directed only toward the "shelter" portion of her total ADC grant, which included regular recurring monthly "needs" as one item and shelter (along with heating fuel) costs as a separate item (see Social Services Law, § 131-a).

During the fair hearing conducted at her request, Mrs. Leone testified that she had been paying at least a portion of her utility bills with funds obtained from her daughter's OASDI benefit checks, and that she would have been able to save a portion of these Federal benefits for her daughter's education had she been receiving a shelter allowance in the amount set forth in section 352.30 of the State commissioner's regulations for a *two-person* household, rather than the pro-rated (lesser) amount payable for two thirds of a three-person household (see 18 NYCRR 352.30 [a]). The determination of the State commissioner, in essence, affirmed the decision of the local agency but expanded thereon by providing that petitioner's *entire* ADC grant should be prorated by two thirds. The commissioner's calculation was as follows:

| | |
|---|---|
| Shelter (⅔ of the actual rent of $250) .......... | $166.67 |
| Fuel (⅔ of the maximum allowance for a three-person grant, i.e., $33) ............... | 22.00 |
| "Basic Needs" (⅔ of a section 131-a grant for three persons, i.e., $200) ............... | 133.33 |
| TOTAL NEEDS ................................ | $322.00 |

Mrs. Leone argues that her allowance should not have been prorated, and that it should have been fixed at the (higher) amounts set forth in the appropriate schedules for a two-person ADC household (e.g., the figure set forth in section 131-a of the Social Services Law as "basic needs" for a two-person ADC household is $150 per month rather than the $133.33 allowed petitioner). In opposition, the State commissioner has cited, *inter alia, Matter of Padilla v Wyman* (34 NY2d 36, app dsmd 419 US 1084) and section 352.30 of the regulations, which, at the time of the decision, provided, in pertinent part: "For budgetary purposes the agency shall include in its estimate of need and application of income all persons applying for or receiving public assistance and care and living as a unit

within the same household" (18 NYCRR 352.30 [a]).[1] The commissioner's position, as stated in her "Decision After Fair Hearing", is as follows: "The [petitioner's] budget should be computed on a household of three persons and since appellant's child's income from social security [OASDI] is sufficient to meet her prorated ⅓ share of the total needs, the agency is required to provide grants based on [a] ⅔ prorated share of the needs for a household of three persons."

In the second matter the petitioner, Mary Delmar, and her spouse, Anthony, were recipients of public assistance in the form of Home Relief (Social Services Law, § 157 *et seq.*). As a condition thereof, Mrs. Delmar was required to and did apply for benefits under the Federal Supplemental Security Income program (US Code, tit 42, § 1381 *et seq.*) in January, 1978 (18 NYCRR 370.11 [b]) and on May 26, 1978 her application was accepted and her eligibility was found to be retroactive to January 1, 1977. The Social Security Administration thereupon issued petitioner's initial "benefits" check and, following routine procedure, forwarded same to the "local" agency, the Nassau County Department of Social Services (see Social Services Law, § 158, subd [a]; 18 NYCRR 370.11). The local agency, in "recouping" from that check what it had paid to the petitioner as "interim assistance" during the retroactive period, determined, *inter alia,* that the interim public assistance advanced to petitioner had *exceeded* the amount of the initial benefits check, and therefore deducted (i.e., recouped)

---

1. The foregoing regulation has since been amended (eff March 30, 1979) so that subdivision (a) now provides as follows: "352.30 Persons included in the budget. (a) For budgetary purposes, the number of persons in the public assistance household shall be those persons that the applicant, recipient or their representative indicates desire to receive public assistance and who reside together in the same dwelling unit. The public assistance household may also include persons who are temporarily absent from such unit, such as children or minors attending school away from home whose full needs are not otherwise met. In determining the cash assistance to be provided, the lower *per capita* needs resulting from the sharing of expenses by all persons in the dwelling unit shall be considered a resource available to reduce the applicant's or recipient's need for public assistance, unless the applicant or recipient demonstrates that this resource is not available. The amount of this resource shall be equal to the difference between the *per capita* of the appropriate grant and allowance contained in schedule SA-2 (set out at section 352.2 of this Part) for the public assistance household in which the applicant or recipient resides, and a *per capita* of a grant and allowance which would be appropriate if all persons in the applicant's or recipient's dwelling unit, except those whose income and resources have been shown not to be available, were included in the public assistance household, multiplied by the number of persons in the public assistance household."

the full amount of that check pursuant to section 370.11 of the regulations (18 NYCRR 370.11 [d]).[2]

Upon being informed of the agency's determination, petitioner, who was no longer eligible for public assistance because of the amount of her monthly SSI benefits, requested a fair hearing to examine the method by which the local agency had calculated the amount of public assistance advanced to her during the retroactive period. At the August 10, 1978 hearing, the agency indicated that the amount deducted had been calculated by "prorating" the couple's public assistance grant during the retroactive period, and that petitioner's pro rata "portion" had thus been determined to be *one half* of the monthly two-person grant. In opposition, petitioner argued that the foregoing was inequitable and that her distributive share for the purposes of recoupment should only have been the *incremental* cost of including her in the grant, i.e., the excess over the amount which would have been payable to her eligible spouse as a *one-person* household.[3] Needless to say, this "incremental" amount was substantially less than the "pro rata" figure relied on by the local agency. The State commissioner agreed with the calculation of the local social services agency, whereupon the instant proceeding was commenced.

We hold that the proration method employed by the State commissioner in each of these cases violates State and Federal law, as well as the commissioner's own regulations. Accordingly, both determinations must be annulled and the matters remanded to the commissioner for further proceedings.

I

At the outset, we acknowledge the fact that the State commissioner's interpretation of the rules and regulations promulgated by her under the auspices of the Social Services

---

2. If "interim assistance" exceeds the initial benefits check, recoupment of the balance from subsequent SSI payments is prohibited (18 NYCRR 370.11 [d]).

3. As recoupment is based on the premise that petitioner should have been receiving SSI benefits rather than Home Relief during the interim assistance period, petitioner, in effect, contended that since her husband has continually remained eligible for public assistance, he *would* have been receiving a full one-person grant during the interim period (rather than one half of a two-person grant) even if *she* had been receiving her SSI benefits then. Accordingly, she argues, the additional amount expended due to her presence in the public assistance household was only the difference between the two-person grant which they were actually receiving and the one-person grant to which her husband was, in any event, entitled.

Law is entitled to great weight *(Matter of Howard v Wyman,* 28 NY2d 434) and we accept, as a principle of general applicability, that it is sound economic practice to calculate public assistance allowances in such a way as to take into account the fact that the purchasing power of a dollar increases as the size of the household increases, i.e., through "economies of scale" which are achieved by the pooling of resources and purchasing in larger quantities. Indeed, the constitutionality of this practice as incorporated into section 131-a of the Social Services Law and its accompanying regulations (see, e.g., 18 NYCRR 352.1, 352.2, 352.3 and 352.5) to reduce the per capita amount of public assistance in multiperson households has been sustained by the Court of Appeals in *Matter of Padilla v Wyman* (34 NY2d 36, 40, 42, *supra),* wherein the court explained:

"The rationale behind the reduction in amount of grants to recipients in a multiperson household is not obscure. The amount of a grant is directly related to the measure of a recipient's needs. In a multiperson household the per capita cost of many items, since they are shared, will be less. This consequence involves no attribution of the contribution by any one member of the household to the maintenance of any other member. Each contributes his own share to the reduced pooled costs. Nor is any reduction in the standard of living implied.
* * *

"As we have indicated, we find no difficulty under the equal protection clause or otherwise with the principle of reduced per capita grants in multiperson [public assistance] households."

In these two cases, however, the issue before us is not the validity of per capita, incremental reductions in the amount of public assistance for multiperson households, but rather the method by which a public assistance allowance may be calculated or reduced where a member or members of a public assistance household are or become ineligible for public assistance. The two proposed methods for taking such occurrences into consideration are (1) *proration,* which involves (a) counting each person residing in the household (whether or not eligible for assistance) to determine household size, (b) referring to the schedules to find the appropriate allowance for that size household, and then (c) "prorating" that allowance to assure that only the eligible members of the household are assisted (e.g., in a household consisting of one ineligible and

two eligible members, two thirds of a three-person grant would be authorized); and (2) the *incremental* approach, which involves counting only the eligible persons to determine household size before referring to the public assistance schedules in order to find the appropriate fixed allowance. As the facts of these cases indicate, the proration method can result in a substantially smaller household allowance and is the method which has been employed by the State commissioner.

Petitioners in each of these cases are or were the recipients of "public assistance", a term which is limited in meaning to those programs specified in subdivision 20 of section 2 of the Social Services Law, and includes, insofar as is here pertinent (1) Aid to Dependent Children (ADC), a Federally assisted program (US Code, tit 42, § 601 *et seq.;* Social Services Law, § 343 *et seq.)* and (2) Home Relief, a wholly State-funded program (Social Services Law, § 157 *et seq.).* As for the separate Federal programs under which certain members of the Leone and Delmar households are receiving benefits, it is clear that while both OASDI and SSI are directed at improving the "public welfare" in a general sense, neither is defined as "public assistance" nor is either so thoroughly integrated with the State public assistance programs as to be their substantial equivalent. However, since each of these Federal programs differs somewhat from the other in terms of its scope and effect, and since each of the instant matters raises the issue of "proration" in a different factual context, we shall address ourselves first to the Leone application, involving OASDI, and then to the Delmar application, involving SSI.

## II

In the Leone matter, the OASDI benefits payable to petitioner's minor daughter rendered her ineligible for public assistance in the Aid to Dependent Children category, as they made her self-supporting under the payment schedule incorporated into section 131-a of the Social Services Law (see, also, 18 NYCRR 352.1). While, under State law, it would appear, on its face, that the public assistance calculation should be made via the "incremental" rather than the "proration" method, e.g., that in a family of three containing only *two* "eligibles" the maximum permissible allowance should be that scheduled for a *two-person* household rather than two thirds of the amount scheduled for a three-person household (see Social Services Law, § 131-a, subds 2 and 3 [which provide that for

*"each additional" needy* person in the household there shall be added an additional amount monthly]; see, also, *Matter of Snowberger v Toia,* 46 NY2d 803, affg 60 AD2d 783), a problem has arisen because the State commissioner has declined to follow this approach and, more specifically, upon a reduction in the number of eligibles from three to two due to the commencement of OASDI benefits, has imposed upon the Leones a pro rata reduction in payments which results in a lower level of assistance than would be appropriate for a two-person ADC household. In our view, the foregoing is impermissible.

Pursuant to sections 233.20 (a) (2) (viii) and 233.90 (a) of title 45 of the Code of Federal Regulations, which are applicable to New York pursuant to subdivision 4 of section 131 of the Social Services Law (see, also, *Van Lare v Hurley,* 421 US 338, 340), the State commissioner cannot *assume* that a nonlegally responsible, nonrecipient of public assistance living within an ADC household will contribute to the support of that assistance unit (see *Johnson v Harder,* 383 F Supp 174, affd 512 F2d 1188, cert den 423 US 876), and we cannot perceive of any reason for excepting from that regulatory proscription a nonlegally responsible child who happens to be a nonrecipient (i.e., is self-maintaining) by virtue of an OASDI grant (see *Matter of Genin v Toia,* 47 NY2d 959; *Matter of Snowberger v Toia,* 46 NY2d 803, affg 60 AD2d 783, *supra; Matter of McNeil v Shang,* 69 AD2d 985; *Matter of Nelson v Toia,* 92 Misc 2d 575, affd 60 AD2d 796, mot for lv to app den 44 NY2d 646). In fact, the contrary would appear to be true (i.e., that the proceeds of such benefits will seldom become an available resource), as the applicable Federal regulations provide, *inter alia,* that OASDI benefits are expendable by the fiduciary (in the instant case, petitioner Leone) *"only* for the use and benefit of [the] beneficiary in the manner and for the purposes determined by [her] to be in the beneficiary's best interest" (20 CFR 404.1603; emphasis supplied) and, if not expended for current maintenance, "shall be conserved or invested on the beneficiary's behalf" (20 CFR 404.1604 and 404.1605; cf. 20 CFR 404.1607). Violation of this fiduciary duty is made punishable as a misdemeanor under Federal law (US Code, tit 42, § 408, subd [e]; see *Matter of Snowberger v Toia, supra; Matter of Nelson v Toia, supra).*

Accordingly, it would appear that under the pertinent regulations OASDI benefits should rarely, if ever, be expended for

the support of the *assistance unit* (as opposed to the beneficiary) and, thus, would not normally result in an "actual contribution" of income cognizable under section 233.90 (a) of title 45 of the Code of Federal Regulations.[4] Under these circumstances, it appears particularly foolhardy to assume that any portion of the said benefits will actually be expended to meet the needs of the nonbeneficiaries (e.g., Mrs. Leone and her son Antonio), or, stated differently, that the monetary needs of the nonbeneficiaries will be reduced by the presence of an OASDI beneficiary in their midst. Absent a cognizable reduction in needs or a demonstrated source of income for their satisfaction, a reduction in the amount of public assistance below that scheduled for the number of eligibles remaining in the ADC household (here, two) is unauthorized (see *Matter of Snowberger v Toia, supra; Johnson v Harder, supra;* 45 CFR 233.90 [a]). In short, no cogent reason has been presented for treating OASDI benefits differently from any other source of income received by a nonlegally responsible, nonrecipient of public assistance living within the ADC household (see *Johnson v Harder, supra).*

Interestingly, the commissioner's own regulations are in substantial agreement with the foregoing analysis. Hence, subdivision (d) of section 352.30 of the regulations, as it read at the time of the commissioner's decision, specifically *excluded* nonlegally responsible nonrecipients of public assistance in the dwelling unit (whether or not self-maintaining) from the determination of the number of persons in the public assistance household (see, also, 18 NYCRR 352.29), and provided, *inter alia,* that such persons shall be considered as "lodgers" and their *actual* contributions included in income only to the extent that their contributions exceeded the presumed or documented cost of providing them with room and/or board.[5] In addition, subdivision (a) of the same regulation

---

4. 45 CFR 233.90 (a) provides, in pertinent part, as follows: "In establishing financial eligibility [for AFDC] and the amount of the assistance payment, only such net income as is actually available for current use on a regular basis will be considered, and the income only of the parent described in the first sentence of this paragraph [natural or adoptive parents or stepparents legally obligated for the support of their stepchildren under state law] will be considered available for children in the household in the absence of proof of actual contributions."

5. Subdivision (d) has since been amended (effective March 30, 1979) so that it no longer applies to the situation at bar. At the time of the commissioner's determination, however, it provided, *inter alia,* as follows: "A non-legally responsible relative or unrelated person in the household, who is not applying for nor receiving public assistance, shall not be included in the budget and shall be deemed to be a lodger or

(18 NYCRR 352.30 [a]), again as it then read, limited the calculation of the size of a public assistance household to those persons *applying for* or receiving public assistance and living within the dwelling unit. Finally, subdivision (b) of section 352.2, subdivision (c) of section 352.3 and subdivision (b) of section 352.5 variously required persons residing with an SSI beneficiary or a *self-maintaining, nonlegally responsible party* to be considered as a separate household for purposes of the public assistance calculation.[6]

The decided cases are not to the contrary. Thus, in *Matter of Nelson v Toia* (92 Misc 2d 575, affd 60 AD2d 796, mot for lv to app den 44 NY2d 646, *supra*), it was determined that petitioner's four minor children of a prior marriage who had become "self-maintaining" by virtue of their receipt of OASDI benefits should have been *excluded* from petitioner's ADC household of three (consisting of herself, her second husband and their child) for the purpose of calculating their monthly public assistance allowance, while in *Matter of McNeil v Shang* (69 AD2d 985, *supra*) it was determined, *inter alia,* that an infant receiving Social Security benefits was not properly included for budgetary purposes in petitioner's ADC household of six. In each of these cases, the commissioner had attempted to prorate the monthly allowance on the basis of a household of seven (so that the Nelsons, for example, were accorded

boarding lodger." The gist of this subdivision, dealing with the treatment of income to the recipient from a "lodger," has now been transferred to 18 NYCRR 352.31 (a) (3) (iv), which, in effect, still excludes from the household for "counting" purposes a nonlegally responsible person who is unwilling to contribute to the household or assume financial responsibility for the applicant or the recipient or his or her children. Notably, the commissioner has never purported to treat Mrs. Leone's daughter as a "lodger" and does not attempt to do so now.

6. As has already been indicated (see n 1, *supra*), subdivision (a) of section 352.30 of the commissioner's regulations was also amended effective March 30, 1979 in an apparent attempt to formalize the commissioner's method of proration as applied in the instant case. Another contemporaneous amendment involved subdivision (b) of section 352.2, which was deleted and the section re-lettered. The repealed subdivision provided as follows at the time of the determination herein "For the purpose of such monthly grants and allowances [i.e., for 'basic needs'] *a child or children or adults residing with self-maintaining nonlegally responsible relatives* or friends, shall be considered as a *separate* household" (emphasis supplied). Interestingly, however, the commissioner left unscathed similar exclusions regarding nonlegally responsible relatives in sections 352.3 (c) and 352.5 (b), which deal (respectively) with shelter grants and heating fuel allowances. These specific exclusions, extant at the time of the determination at bar, only serve to further demonstrate the questionable nature of the commissioner's decision to prorate the Leone grant. As for the recent amendments, to whatever extent they may be in conflict with our decision here today, we will, in an appropriate case, proceed to declare them invalid.

three sevenths of a seven-person ADC grant, while the Mc-Neils were accorded six sevenths of a seven-person grant), but the court in each instance rejected this approach, refused to count the OASDI recipients, and directed (in effect) that the incremental approach be employed by awarding the Nelsons a full three-person grant and the McNeils a full six-person grant (see, also, *Matter of Snowberger v Toia,* 60 AD2d 783, affd 46 NY2d 803, *supra*). In a similar vein, the Court of Appeals has only recently stated that: "A child's Social Security benefits may *not* be deemed available income for the purpose of determining eligibility for aid to dependent children when such benefits are sufficient to satisfy the needs of the child and the representative payee does not choose to include the child within the AFDC assistance unit" *(Matter of Genin v Toia,* 47 NY2d 959, 960, *supra;* emphasis supplied).

In view of the foregoing statutory and decisional law, as well as the commissioner's own regulations, it is our belief that once petitioner's daughter became economically self-sufficient by virtue of her reciept of OASDI benefits she should have been *excluded* from the Leone household for the purpose of determining the appropriate public assistance grant, or, at the very least, that the option of removing her from the grant should have been accorded to Mrs. Leone (see *Matter of Genin v Toia, supra*). Manifestly, however, the commissioner could not automatically continue the daughter in the household for budgetary "counting" purposes, assume that she would be contributing her pro rata "fair share" to the common expenses, and then prorate the amount of the grant accordingly, all in the absence of any legal responsibility on her part to support either her mother or her brother or authority on the commissioner's part to compel any such application of her OASDI benefits (see *Matter of Genin v Toia, supra; Matter of Snowberger v Toia, supra; Matter of McNeil v Shang, supra; Matter of Nelson v Toia, supra;* see, also, *Johnson v Harder,* 383 F Supp 174, affd 512 F2d 1188, cert den 423 US 876, *supra*).[7] While no longer eligible for ADC in her own right, the daughter's ineligibility could not therefore serve as the predicate for a pro rata reduction in payments to her mother and

---

7. In our view, the State commissioner may not take solace from the fact that Mrs. Leone testified at the fair hearing that her daughter's OASDI benefits were utilized, at least in part, to pay certain of the utility bills, as the foregoing is directly traceable to the hardship created by the local agency's reduction (via proration) of the "shelter" portion of her ADC grant and the resulting need to make up the "shortfall" by diverting other assets from their intended uses to pay current expenses.

brother below that which could have been payable to an ADC household of two. As we have thus concluded that an OASDI beneficiary must be excluded from the public assistance calculation, it follows *ex necessitate* that the commissioner's determination cannot be permitted to stand.[8]

### III

The second application differs from the first in that (1) Mrs. Delmar's SSI benefits do not necessarily make that petitioner self-supporting, and (2) spouses (unlike siblings) *are* legally responsible for the support of one another (Social Services Law, § 101, subd 1). The difficulty with characterizing an SSI beneficiary as self-maintaining lies primarily in the fact that the Federal program was established solely to provide a Federally-funded "floor" for annual assistance, and that supplementation by States such as New York (which had a *higher* pre-1974 level of assistance) is specifically permitted (Social Services Law, § 207 *et seq.;* see, also, US Code, tit 42, § 1381 *et seq.;* 63A NY Jur, Welfare and Social Security, § 209). However, notwithstanding the fact that an SSI beneficiary perhaps may not be considered self-supporting, and thus may not rely upon the whole of our logic in the *Leone* determination to contest the proration (for purposes of recoupment) of her interim public assistance grant, there still exists a great similarity between the two cases, as SSI benefits, like OASDI

---

8. The probable reason why OASDI benefits have not been integrated into State public assistance programs is suggested by the description of the purpose *behind* the Federal insurance program in *Mathews v De Castro* (429 US 181). The court there, in an opinion by Mr. Justice STEWART, observed the following (pp 185-186):

"The old-age and disability insurance aspects of the Social Security system do not purport to be general public assistance laws that simply pay money to those who need it most. That was not the predominant purpose of these benefit provisions when they were enacted or when they were amended. Rather, the primary objective was to provide workers and their families with basic protection against hardships created by the loss of earnings due to illness or old age.[6]

"6. The old-age and disability insurance programs are distinct from the provisions for public assistance to the aged and disabled also contained in the Social Security Act * * * [Thus,] Congress in 1935 contemplated that the old-age insurance benefits would be 'payable wholly regardless of the need of the recipient.' * * * The public-assistance-for-the-aged-program, on the other hand, was designed 'to provide for old people who are dependent upon the public for support'."

Accordingly, OASDI benefits differ in a fundamental sense from public assistance programs, even though both of them tend to alleviate financial distress. As they do differ, however, it is entirely consistent to require that an OASDI beneficiary be excluded from any public assistance calculations (cf. *Matter of McNeil v Shang,* 69 AD2d 985).

payments, are separate and distinct both factually and conceptually from public assistance per se. It is this *dis*similarity which is, in our view, fatal to the commissioner's position here.

The issue of SSI's similarity to New York's own public assistance programs takes on significance due to the resolution of the second issue posed in *Matter of Padilla v Wyman* (34 NY2d 36, *supra),* to wit, the propriety of prorating public assistance benefits in those multiperson households in which one or more persons are recipients of different *categories* of public assistance. In *Padilla,* the petitioner, Mrs. Padilla, had been receiving a one-person grant of public assistance in the category of Old-Age Assistance, but upon suffering a stroke and moving into the home of her daughter and grandchild (recipients of a two-person ADC grant), the local social services agency reduced the sum total of both grants of "basic needs" to that payable to a household of three (rather than paying Mrs. Padilla a full one-person grant and her daughter a full two-person grant) by prorating the amounts awarded to either by the appropriate fraction, i.e., by reducing Mrs. Padilla's Old-Age Assistance grant of basic needs to one third of that payable to a three-person household and by reducing her daughter's ADC grant to two thirds of a three-person grant.[9] Faced with this decision, petitioner sought to formulate an equal protection argument by claiming, *inter alia,* that the treatment accorded her (combining her one-person Old-Age Assistance grant with her daughter's two-person ADC grant to yield a single three-person grant) was disproportionate with that accorded a self-supporting individual under section 352.2 (b) of the commissioner's regulations, which then provided "For the purpose of such monthly grants and allowances [i.e., of public assistance] a child or children or adults residing with self-maintaining nonlegally responsible relatives or friends, shall be considered as a separate household" (34 NY2d, at p 40). In essence, petitioner argued that if she were self-supporting her income would *not* have been counted and her daughter's two-person ADC grant would not have been altered, but

9. Pursuant to subdivision 1 of section 131-a of the Social Services Law, *all* types of public assistance are payable in accordance with the schedule incorporated therein and the regulations promulgated thereunder, so that the *amount* payable per person does not vary with the *category* of assistance being received. Accordingly, as applied to the instant case, the total amount payable as basic needs to a three-person household would be the same regardless of whether that household was receiving Old-Age Assistance or ADC.

that, because her sole source of income was public assistance, she was being required, in effect, to contribute toward her daughter's household the difference between her full one-person grant and one third of a three-person grant.

Although dismissed as academic (on the ground that invalidation of the above regulation would not have benefited the petitioner), the Court of Appeals went on to note that petitioner's equal protection argument was lacking in merit, as there was a rational *economic* basis for distinguishing between a household made up solely of public assistance recipients (be they in the same or different categories) and one comprised of recipients and nonrecipients (34 NY2d, at p 41): "Although the Department of Social Services cannot * * * mandate the exact uses for which public assistance grants shall be expended, nonetheless such expenditures are subject to the general oversight of the department. To a greater extent than may commonly be comprehended, recipients of public assistance do look to their social workers for guidance and counsel * * * There is [therefore] a nexus of practical significance, if not legal sanction, which characterizes the relationship between recipients and [their social] workers, for which there can be no counterpart as between representatives of the department and the self-supporting members of a household in which a recipient may reside." In our view, this distinction regarding self-maintaining persons is just as valid for other nonrecipients, regardless of whether their nonrecipient status be based upon strict self-sufficiency (as in *Leone)* or, as in the instant case, on some other basis of ineligibility.

The question of the equivalency of SSI and public assistance for the purposes of proration (as in *Matter of Padilla v Wyman, supra)* was considered by the Third Department in *Matter of Barton v Lavine* (54 AD2d 350), wherein the court, while precluding the proration of ADC based on the presence of an SSI beneficiary in the household (accord *Matter of Barton v Lavine,* 38 NY2d 785; *Matter of Schimmel v Reed,* 50 AD2d 1085, affd 40 NY2d 887), inferred, perhaps inadvertently, that SSI and public assistance are merely "different categories of public support" (54 AD2d, at p 354). SSI can, however, be distinguished from public assistance at least in the aspect of concern here—the propriety of a *Padilla*-type proration of like benefits—and such distinction is suggested by the statutes themselves. Thus, the benefit rates for SSI differ substantially from those applicable under public assistance

(compare US Code, tit 42, § 1382 with Social Services Law, § 131-a), while the recognition of economies of scale in SSI households is *limited* by Federal law to those situations in which *both* of the spouses are recipients of SSI (see US Code, tit 42, § 1382, subd [b], par [2]). Moreover, the State commissioner's own regulations pertaining to SSI benefits provide, *inter alia,* that the State cannot recoup "interim" public assistance paid during the pendency of an SSI application in excess of the initial (i.e., retroactive) benefits check (18 NYCRR 370.11 [d]), while other aspects of the regulations appear to follow an incremental approach regarding recipients of SSI and specifically cite SSI beneficiaries as persons to be *excluded* from the public assistance household when calculating household size for budgetary purposes (18 NYCRR 352.30 [b]; 352.2 [b]; see, also, 18 NYCRR 352.3 [c]; 352.5 [b]; *Jones v Califano,* 576 F2d 12).[10] Finally, the "nexus of practical significance" adverted to in *Matter of Padilla* (34 NY2d 36, 41, *supra)* would appear to be no more present here than in a household containing a self-supporting member, except in those rare instances in which an SSI beneficiary also happens to qualify for some form of public assistance.[11]

Accordingly, we conclude that despite the similarity in general purpose between SSI and public assistance, the two forms of "public support" cannot be considered merely different types of public assistance for purposes of proration under *Matter of Padilla v Wyman (supra),* and that the commissioner's attempt to do so here under the aegis of recouping "interim assistance' must fail. In this connection, we note but do not rely upon those cases which have disapproved the proration of grants in the category of Aid to Dependent Children based upon the presence of an SSI beneficiary in the household (e.g., *Matter of Barton v Lavine,* 38 NY2d 785, *supra; Matter of Schimmel v Reed, supra),* and, while recognizing that there is a specific statutory predicate for such result (US Code, tit 42, § 602, subd [a], par [24]), further note that under State law both Home Relief and ADC are conceptually similar and monetarily equivalent, and that no sound

10. Thus, pursuant to regulation, *Mr.* Delmar would apparently continue to receive a full one-person grant of public assistance in the category of Home Relief, despite his wife's continued receipt of SSI benefits. Accordingly, the commissioner's position would appear to be that proration is applicable only during the "interim assistance" period. This artificial distinction cannot be accepted (see *infra).*

11. Note, however, that a recipient of SSI is ineligible for Home Relief (Social Services Law, § 158, subd [a]; 18 NYCRR 370.4).

reason for a disparity in treatment between them for the purposes of proration appears (see *Matter of Gabel v Toia,* 64 AD2d 267).

We reject as sophistry the commissioner's attempt to avoid this result by distinguishing an SSI "applicant" from an SSI "beneficiary" (on the ground, *inter alia,* that the former, but not the latter, is an actual *recipient* of public assistance), as the recoupment of interim assistance from the initial SSI benefits check is theoretically permitted only because the SSI *applicant* in receipt of interim public assistance has been granted retroactive SSI *benefits.* In our view, in light of this conceptual "relation back," any regulations of general applicability regarding SSI *beneficiaries* must be accorded a similar retroactive application, at least insofar as they purport to affect a reduction of those SSI benefits paid out during the retroactive period. Stated differently, it is our belief that for the purposes of recoupment, an SSI *applicant* who has been awarded retroactive benefits is, as to those benefits, an SSI *beneficiary* and must be treated accordingly.

## IV

As the commissioner has correctly pointed out, one of the primary virtues of her method of proration is that the nonrecipient's income (from whatever source) is deemed available to meet household expenses only for the *limited* purpose of requiring that nonrecipient to meet his "fair share" thereof. However, despite its attractive tone, this "fair share" argument has several substantial shortcomings when applied in the real world to households containing both recipients and nonrecipients.

The major fallacy in the commissioner's proration theory from an economic standpoint lies in the fact that it is calculated on the basis of the public assistance schedules, which represent, despite varying dollar amounts, *a single, minimum standard of living* that the Legislature has determined to be appropriate.[12] By taking into account economies of scale, the Legislature has provided that these dollar amounts may increase more slowly than family size while preserving the single standard of living (e.g., the grant for a household of four is not twice as large as the grant for a household of two)

---

12. Of course, the dollar amounts vary with household size (Social Services Law, § 131-a).

(Social Services Law, § 131-a; see *Matter of Padilla v Wyman, supra),* but the commissioner has gone one step further and assumes that *nonrecipients* living in the same household will contribute toward common expenses in order to help maintain that *same* standard of living. This, however, will not always be the case.

It is, of course, possible that the standard of living of a particular household will match the one set forth in section 131-a, i.e., that in a given household the costs incurred will actually match the costs budgeted for it in the public assistance tables. Theoretically, these costs could then be allocated on the basis of household size to yield a per capita public assistance figure, but where there is a nonrecipient present in the house, (1) he may *not* be contributing enough income to match his per capita "fair share" of the household costs, or (2) he may be contributing (in money or in kind) *more* than the per capita "fair share" allocated to him in this fashion. The equilibrium point will, of course, be reached when the nonrecipient contributes or incurs as household costs a dollar amount *equal* to his pro rata (per capita) "fair share" derived from the public assistance schedules, but it is only in this one particular instance that the commissioner's pro rata reduction of benefits due to the presence of a nonrecipient in the household will comport with the legislative plan.[13]

On the other hand, if the nonrecipient does *not* contribute his "fair share" (i.e., he contributes or incurs costs for household purposes *below* the equilibrium point), then the standard of living of the household will fall below the level fixed by the Legislature and, more importantly, the nonrecipient may, in fact, be subsidized by the recipients, thus depriving them of their full public assistance benefits. This would occur, for example, if the recipients were to bear all of the common expenses out of their public assistance dollars, or if the recipients were merely to pool their public assistance dollars with whatever limited funds the nonrecipient might care to contribute. In either event, the income available for household expenditures will fall below the amount fixed by statute for a

13. For example, pursuant to Schedule SA-2, which appears at section 352.2 of the commissioner's regulations, it is provided that the basic grant for a three-person public assistance household is $200 per month, which translates to $67 per capita. Thus, if one of the three persons is a nonrecipient, the equilibrium point will be reached when the former contributes exactly $67 per month to the household, in which event the public assistance standard of living will be capable of being maintained on a two-thirds grant.

household of similar size containing recipients only and result in a reduction of the recipients' standard of living below that deemed acceptable by the Legislature.[14] It is, of course, possible for the converse to occur, i.e., for the nonrecipient to contribute *more* than his fair share, and in such situations the household may benefit from an increased standard of living as compared with the statutory guidelines.[15] The more serious problem, however, arises in the situation posited above, for it is in this situation that the intended beneficiaries of the legislative plan (i.e., the eligible recipients) may be prejudiced

---

14. The evil of this situation can be demonstrated by hypothecating a household of three including one nonrecipient who fails or refuses to contribute to common expenses. Instead of a two-person "basic needs" grant of $150, the commissioner, in such situation, would accord the two eligible recipients only two thirds of a three-person grant (i.e., $134) on the *assumption, inter alia,* that the nonrecipient will make up the "shortfall" in income by contributing an additional $67 for the use of the household (Social Servcies Law, § 131-a, subds 2 and 3). Where such contributions are not forthcoming, however, the household or at least the two eligibles will be forced to subsist on the lesser amount, thus necessitating a diminished standard of living for the recipients of public assistance.

15. The evil in this situation lies in its practical consequences. Currently, when such a nonrecipient "shares" a household with recipients, the latter's public assistance is immediately reduced by proration, without regard to whatever right the nonrecipient may have to enjoy a *personal* living standard in excess of the minimum decreed by the Legislature for public assistance recipients. Under such circumstances, unless the nonrecipient embraces the public assistance living standard, his income and expenditures will necessarily throw the commissioner's economies-of-scale theory out of kilter, since any "sharing" of household expenses by the nonrecipient will necessarily result in his subsidizing (i.e., benefiting) the recipients to the extent that their new combined living standards exceed the minimum to which they are entitled under the public assistance schedules. Clearly, this subsidization would be improper if the nonrecipient's income is legally restricted for his own use and benefit (e.g., the OASDI benefits in *Leone*). Furthermore, and of broader significance, since it is unrealistic to assume that any one member of a household can actually enjoy a standard of living substantially different from its other members, the cutback in the recipients' public assistance will force the nonrecipient to bear the entire cost of exceeding the minimum living standard and may cause the dissolution of the family unit where there is no legal restraint upon any member leaving the household. Thus, in a hypothetical household of three containing one nonrecipient, the presence of the nonrecipient would presently result in the proration of benefits, while his removal from the household would presumably result in the restoration of full benefits to the two remaining members. Accordingly, assuming an unwillingness on the part of the nonrecipient to subsidize the remaining household members (and thereby reduce disproportionately his own standard of living), the former may now achieve his objective *only* by dissolving the household. This represents a shortsighted public policy, as it would generally be considered preferable for the recipients and nonrecipients to live together in a family unit (e.g., the Delmars), especially when it would actually *cost the public no more in public assistance dollars in these situations than it would if the household had been dissolved and the public assistance cuts restored* (see, e.g., *Matter of Slochowsky v Shang,* 67 AD2d 926, affd 48 NY2d 887).

by proration and their standard of living reduced.[16] Still, the concept is the same and cases involving both ends of the spectrum may serve to help demonstrate some of the practical difficulties inherent in the commissioner's "fair share" analysis.

Thus, in situations involving nonrecipients whose contributions to household expenses fall below their hypothecated "fair share", it has been held by a number of courts that notwithstanding any derivative benefits which may accrue to such nonrecipients, proration cannot be tolerated where the intended beneficiaries of the public assistance program (i.e., the eligible recipients) will suffer. A case in point is *Matter of Edwards v Toia* (61 AD2d 1089, mot for lv to app den 44 NY2d 649) wherein the court stated the following: "This appeal raises the issue of whether it is proper to compute an ADC grant on a pro rata basis, where the child is living with an ineligible parent * * * While appellant is correct in his contention that paying a dependent child a full one-person household allowance, rather than a pro rata share of a two-person household allowance, benefits the ineligible parent with whom the child resides, the unmerited parental benefit must be indulged lest the primary purpose of the ADC program that an eligible child receive full benefits be frustrated. Diminution of aid to children where parents refuse to utilize available resources has been uniformly condemned * * * When there is a finding of need, as here, minor children may not be deprived of the assistance they are entitled to receive * * * nor may the amount of that assistance be reduced by a pro rata computation" (see, also, *Matter of Gabel v Toia,* 64 AD2d 267, *supra; Matter of Foran v Dimitri,* 62 AD2d 1124). Somewhat similarly, the United States Supreme Court in 1975 invalidated New York's prior system of prorating shelter allowances

---

**16.** It is, of course, possible for eligible recipients to be adversely affected even while receiving a full grant, e.g., where an ineligible nonrecipient is admitted into the household and contributes nothing to such shared expenses as food and rent. In such situations, a full two-person grant, for example, may have to be utilized to provide for three, but at least the consequent reduction in the standard of living in that case will not be the product of State action, as the two eligible recipients would still be provided with a full two-person grant. Under the commissioner's proration approach, however, the two eligibles would only receive two thirds of a three-person grant, thereby worsening the monetary "shortfall" and depriving them of the full benefits which the Legislature has deemed appropriate. More importantly, it would require the *non*recipient to contribute the difference to household expenses *before the eligible recipients could even be raised to the poverty level,* thus frustrating the statutory scheme.

as it affected public assistance households containing nonlegally responsible members (i.e., nonpaying "lodgers") on the ground, *inter alia,* that proration, as practiced, was an impermissible attempt to discourage the presence of noncontributing parties by penalizing the recipients, who were the intended beneficiaries of the legislative scheme *(Van Lare v Hurley,* 421 US 338, *supra).*

As for cases involving the converse situation (i.e., nonrecipients whose contributions toward household expenses exceed their proportionate "fair share"), it was held by this court in *Matter of Slochowsky v Shang* (67 AD2d 926, affd 48 NY2d 887), that such payments conferring an actual benefit upon a public assistance recipient may not be *assumed* to be a gift by the nonrecipient (and the grant reduced) in a case involving a stepfather who was providing a home for his stepchildren (the recipients of AFDC), but who had repeatedly indicated that he was unwilling and unable to contribute toward their needs. In eliminating the stepchildren's shelter and fuel allowance, the commissioner, in effect, assumed that the stepfather would be contributing that amount, but this court annulled that determination on the ground, *inter alia,* that under Federal law the stepfather's income could not be considered in fixing the grant (see 45 CFR 233.90 [a]), and that, absent an actual contribution on his part to their needs, the children were entitled to receive a shelter allowance sufficient to cover the *actual* cost of providing them with shelter up to the maximum amount payable under the public assistance schedules for a hypothesized household of stepchildren only[17] (cf. *Houston Welfare Rights Organization v Vowell,* 555 F2d 1219, 1224, cert granted *sub nom. Chapman v Houston Welfare Rights Organization,* 434 US 1061). Another variation of the same theme was analyzed in *Swift v Toia* (461 F Supp 578, affd 598 F2d 312), wherein one member of a public assistance household was ineligible for AFDC because she received child support "in kind" from her nonresident father. In that case the court

---

17. This, in essence, was an "incremental" approach, as the benefits restored were calculated on the basis of a household comprised solely of the two stepchildren, i.e., the maximum shelter allowance for a household of two. By way of contrast, the maximum "prorated" shelter allowance would have been calculated by counting the total number of persons in the household headed by the stepfather (here, four) and reducing the allowance for a household of that size by an amount equal to the number of ineligible members (here, two). Accordingly, the maximum permissible grant would have been one half (¾) of the scheduled shelter allowance for a household of four.

held, in effect, that a pro rata reduction in public assistance would only be permissible if the commissioner were able to establish that some of this "in kind" support had actually been contributed to the household and was available to defray the nonrecipient's share of household expenses.

In our view, the foregoing brief cross-section demonstrates some of the practical difficulties of equitable allocation inherent in the commissioner's proration scheme which, we believe, robs it of its limited utility in most cases. This is, however, but a secondary consideration, as we have further concluded (1) that proration based on assumed contributions operates to the detriment of eligible recipients and does violence to the statutory scheme, and (2) that predominant Federal policy precludes any method of calculating public assistance (such as proration) which tends to impair the full enjoyment of Federal benefit programs such as SSI and OASDI by beneficiaries thereof who also happen to reside in households containing public assistance recipients.

Given the foregoing, and given the apparent statutory preference for calculations made under the incremental (rather than the proration) method (see Social Services Law, § 131-a, subds 2 and 3), we have formed the opinion that at least in those public assistance households containing OASDI or SSI beneficiaries, the method of calculating public assistance for the remaining (eligible) household members must be by the incremental method (see 18 NYCRR former 352.30 [a] [budget includes persons living in the household *and* applying for or in receipt of public assistance]; 18 NYCRR 352.30 [b] [SSI]; 352.30 [d]; 352.2 [b] [SSI]; 352.3 [c] and 352.5 [b] [self-maintaining, nonlegally responsible nonrecipients]; see, also, *Matter of Hinson v Blum,* 94 Misc 2d 601; cf. 18 NYCRR 352.32 [e] [f] [co-operative assistance cases]). We have, moreover, concluded that the Federal benefits payable under either of these two programs can neither be affected directly, by way of a reduction in current public assistance payments to recipients living with Federal beneficiaries, nor indirectly, through an overly large deduction from an initial SSI benefits check purportedly representing the recoupment of interim public assistance advanced to the beneficiary. Accordingly, the determination in each of these applications must be annulled.

## V

■ We note in passing that had the issue been raised in

*Leone,* there would appear to be a substantial equal protection problem in the commissioner's treatment of public assistance recipients who reside alone as opposed to those who reside with self-maintaining nonrecipients (cf. *Matter of Padilla v Wyman,* 34 NY2d 36, *supra).* This problem does not arise, however, in the *Delmar* proceeding (in which it is argued), as the commissioner therein performed no act of discrimination in carrying out her policy of recoupment, although her method of calculation was improper. Without a valid constitutional claim, Mrs. Delmar cannot be awarded attorney's fees pursuant to section 1988 of title 42 of the United States Code.

■ We also decline to grant petitioner's request to prosecute the *Delmar* application as a class action on behalf of all SSI beneficiaries in Nassau County whose initial benefit checks have been the subject of an improper deduction. As a rule, *stare decisis* precludes class action certification in article 78 proceedings, as class actions are not generally regarded as a superior means of adjudicating claims involving governmental operations *(Matter of Jones v Berman,* 37 NY2d 42). Moreover, potential class members should first be required to exhaust their administrative remedies and cannot, absent special circumstances not here present, circumvent this requirement through the mechanism of class action certification (see *Matter of Schimmel v Reed,* 50 AD2d 1085, affd 40 NY2d 887, *supra; Matter of Barton v Lavine,* 54 AD2d 350, *supra).* Finally, inasmuch as we believe that *stare decisis* will suffice to preclude the State commissioner from employing her proration method *in futuro* in cases involving nonrecipients such as those at bar, we decline at this time to issue an injunction.

■ In each proceeding the commissioner is therefore directed to recompute the appropriate measure of public assistance in accordance with this opinion (see *Matter of McNeil v Shang,* 69 AD2d 985, *supra).* In the *Leone* matter this will mean the retroactive restoration of benefits based on a two-person ADC household grant, while in *Delmar* it will involve a *de novo* calculation of the amount to be recouped from petitioner's initial SSI benefits check as interim assistance (i.e., the difference between a two-person grant and the one-person grant to which her husband would have been entitled) and a refund of the moneys withheld in excess of that amount.

LAZER, J. P., RABIN and O'CONNOR, JJ., concur.

Petition (in *Leone* proceeding) granted to the extent that

the determination of the State commissioner, dated January 23, 1978, is annulled, on the law, without costs or disbursements, and the matter is remitted to the State commissioner for further proceedings consistent with the opinion herein.

Petition (in *Delmar* proceeding) granted to the extent that the determination of the State commissioner, dated September 5, 1978, is annulled, on the law, without costs or disbursements, and the matter is remitted to the State commissioner for further proceedings consistent with the opinion herein.